# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 12, 2021          Decided June 4, 2021

No. 20-5161

PHOENIX HERPETOLOGICAL SOCIETY, INC.,
APPELLANT

v.

UNITED STATES FISH AND WILDLIFE SERVICE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:17cv02584)

*Frederick Coles III* argued the cause and filed the briefs for appellant.

*Benjamin Richmond*, Attorney, argued the cause for appellees. With him on the brief were *Jonathan D. Brightbill*, Principal Deputy Assistant Attorney General, *Eric Grant*, Deputy Assistant Attorney General, and *Andrew Mergen* and *Rachel Heron*, Attorneys. *Rebecca Jaffee*, Attorney, entered an appearance.

Before: ROGERS and KATSAS, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*:  The Fish and Wildlife Service denied two permit applications from the Phoenix Herpetological Society.  The Service first blocked the export of four blue iguanas, an endangered species, to a Danish zoo.  It then declined to renew the captive-bred wildlife registration for the Society's entire collection of blue iguanas.  The Society contends the denials were arbitrary and capricious.  But the record backs the agency's findings, and its conclusions follow logically.  We affirm.

**I**

The nonprofit Phoenix Herpetological Society collects and raises rare reptiles, including the Grand Cayman Blue Iguana. The blue iguana is Grand Cayman's largest native land vertebrate.  When full-grown, it stretches approximately five feet long and weighs over twenty-five pounds.  Although the iguanas can survive 25 to 40 years in the wild, they have been known to live for almost 70 years in captivity.

Blue iguanas are protected by the Endangered Species Act.[1]  In 1981, they were listed on Appendix I ("species threatened with extinction") of the Convention on International Trade in Endangered Species of Wild Fauna and Flora.[2]  The Endangered Species Act implements that Convention, prohibiting "any trade in any specimens" contrary to the

---

[1]  *See* 16 U.S.C. § 1531 *et seq.*

[2]  Mar. 3, 1973, 27 U.S.T. 1087.

treaty's provisions.[3]   In 1983, the blue iguana was also designated as "endangered" under the Endangered Species Act itself.  Both listings have persisted until today.

The Act (and through it, the Convention) places numerous restrictions on blue iguana ownership, including bans on their collection, trade, and export.   Congress has nonetheless authorized the Secretary of the Interior to permit "any" otherwise prohibited conduct "to enhance the propagation or survival" of a protected species.  Relying on the Secretary's delegated authority, the Fish and Wildlife Service promulgated regulations governing the permits at issue in this case.[4]

The Society applied for permits to (1) export four blue iguanas to a Danish zoo and (2) continue its captive-bred wildlife program at its Arizona facility.  The purpose of an export permit is self-evident; the Society's captive-bred wildlife registration allows it to hold, manage, and exhibit its blue iguanas (among other acts).[5]

Appellants must satisfy certain conditions to gain the permits; we limit our discussion to the disputed requirements. For export, the Service must find that "proposed export would not be detrimental to the survival of the species" to comply with the Convention.[6]   The Service also evaluates—under Endangered Species Act criteria—whether a permit "would be

---

[3] *See generally Defs. of Wildlife, Inc. v. Endangered Species Sci. Auth.*, 659 F.2d 168, 174–75 (D.C. Cir. 1981).

[4] *See* 50 C.F.R. §  13.1 *et seq.*

[5] *See* 50 C.F.R. §  17.3.

[6] 50 C.F.R. § 23.36(c)(2).

likely to reduce the threat of extinction facing the species."[7] Although these two standards seem similar, the former ensures that export *will not do harm* to the species in the wild. The latter turns on whether export will make an *affirmative* contribution to the species' survival. *Cf.* Convention Art. XIV, ¶ 2(a) (Parties may adopt "stricter domestic measures" on top of Convention requirements).

For both an export permit and a captive-bred wildlife registration, the applicant bears the burden of showing that its specimens were lawfully acquired.[8] An applicant needs to make this showing, according to the Service, not just for the *particular* specimens that it has bred. It must also demonstrate lawful importation of those specimens' *ancestors*.[9]

\* \* \*

In its initial export application, the Society proposed transferring four iguanas—free of charge—to the Aalborg Zoo in Denmark. The Society represented that "parents maintained in [its] collection" hatched the four "siblings." J.A. 627, 631. There are no blue iguanas in Denmark; the Aalborg Zoo plans

[7] 50 C.F.R. § 17.22.

[8] *See* 50 C.F.R. §§ 23.36(c)(1), 23.60(a). We note, however, that the Service's position that the lawful acquisition requirement applies not only to export permits but to captive-bred wildlife registrations appears to be unsupported. *Compare id.* § 23.36(c)(1), *with id*. §§ 17.21(g), 17.22. But since the Society did not raise that argument, we do not address it.

[9] One might also question whether this final requirement is a permissible interpretation of the Convention or Endangered Species Act. *See* Oral Arg. 1:13–1:14 (Mar 12, 2021). Those authorities make no mention of a specimen's parental stock. Yet again, the Society did not advance the argument.

to establish a new conservation and breeding program with the Society's specimens. Responding to the Service's request for additional information about the parental stock of the iguanas, the Society referenced imports by the San Diego Zoo in 2005 and by an organization called the Life Fellowship in the 1970s and 1980s.

The Service denied the application in an informal adjudication. Because the four reptiles are siblings and the zoo possesses no other blue iguanas, the agency explained that they were "unsuitable for breeding among themselves once exported." J.A. 655–56; *see also* J.A. 678. Therefore, the proposed program would not enhance the propagation or survival of the species. Furthermore—despite the Society's assertions about the importations of the iguanas' ancestors— the Service had no record of an import permit for blue iguanas in 2005. The Society supplied no evidence to support its lawful importation claims.

While awaiting the export permit decision, the Society also applied to renew its existing captive-bred wildlife registration for its entire collection of 22 blue iguanas. But since it submitted no information about the parental stock of these iguanas, the agency declined to determine that they had been lawfully acquired. The Service acknowledged that it had previously registered the Society's iguanas. But due to new questions about the iguanas' parental stock (arising from the export application), the Service was reevaluating the validity of the prior registrations. The agency therefore denied the registration until it "can confirm the legal origin of the species." J.A. 373.

The Society requested reconsideration of both denials. Appellant claimed the four iguanas were not actually siblings—contradicting its initial representation. In the revised

account, one pair of iguanas was descended from wildlife captured on Grand Cayman in 1971 and hand carried to the United States by Ramon Noegel—a pastor, breeder, and conservationist who ran the Life Fellowship mentioned in the initial application. Noegel's 1971 acquisition would predate the Endangered Species Act, and it is undisputed that a pre-Act acquisition is lawful.[10]

The Society claimed that the second duo came from Ty Park, an iguana expert in Florida. The application, however, made no mention of how Park obtained the iguanas. No explanation was given for the previous reference to a 2005 import by the San Diego Zoo.

In support of this new claim involving Noegel's acquisition, the Society submitted a 2006 affidavit from David Blair, another iguana collector. Appellant explained that Noegel gave three of his lawfully acquired iguanas to Blair. Blair then transferred offspring of those iguanas to a woman in Florida, who then gifted her specimens to the Society. The Blair affidavit states that he "obtained [the iguanas] in 1971 from Ramon Noegel in Florida." And Noegel "advised [Blair] with complete certainty that the [iguanas] were captured as wild-caught on Grand Cayman Island." J.A. 447. Blair and Noegel are both since deceased.

The Service upheld the denial of both permits. Although the Service determined that it would not be "detrimental" to export the Noegel stock iguanas, the agency could not approve export of the Park stock iguanas since the Society, again, submitted no information about their ancestors' importation. Because the Service could still not "confirm whether specimens imported into the United States or any progeny resulting from those imported specimens has been legally

---

[10]  *See* 50 C.F.R. § 17.4.

acquired," it denied the reconsideration request. J.A. 455.

The Society then appealed the denial of its reconsideration request—its final appeal to the agency. This time, in yet another change of position (without explanation), the Appellant claimed the iguanas for export were really all *Noegel* stock iguanas.

The Service again upheld its denial of the export permit. It determined (as in the original denial) that the export of four related animals "to a facility with no other specimens" will not "enhance[] the propagation or survival of the species." J.A. 616; *see also* J.A. 680 ("[B]reeding between these specimens would not be consistent with maintaining genetic diversity for the species.").

Following additional inquiries, the Service also stood by its denial of the Society's registration application.[11] The agency explained that it "lack[ed] sufficient information pertaining to legal acquisition of all founder stock" in the Society's collection. J.A. 614; *see also* J.A. 616 ("[The Service] considered the information included in your application, including *various explanations* regarding the lawful origin of the founder stock. . . . [T]his information was insufficient to demonstrate that the founder stock was lawfully acquired.") (emphasis added). And without information on the legal acquisition of *all* of the parental stock of Appellant's blue iguanas, the Service could not make the required findings.

Having exhausted its administrative remedies, the Society brought its dispute to the district court. Seeing no problem with

---

[11] The Service conducted its own investigation into whether Noegel legally imported his blue iguanas into the United States. In light of our approval of the Service's rejection of Appellant's position, it is unnecessary to discuss the agency's investigation.

the denials, the court granted the Service's motion for summary judgment. *Phoenix Herpetological Soc'y, Inc. v. United States Fish & Wildlife Serv.*, No. 17-CV-02584, 2020 WL 3035037 (D.D.C. June 5, 2020). This appeal followed.[12]

## II

The Society does not challenge the lawfulness of the permit regulations. It instead claims to have satisfied the requirements. As to the export permit, Appellant contends that the agency contradicted itself when it determined that the iguanas lacked sufficient genetic diversity. Alternatively, the Society argues that the agency's conclusion lacks any evidentiary foundation. Appellant then, regarding the denial of the registration permit, asserts that the service improperly ignored the Blair affidavit.

---

[12] Appellant speculated at oral argument that, if it were to lose its captive-bred wildlife registration, it would be forced to "destroy" its specimens. *But see* 16 U.S.C. §§ 1532(20), 1538(a)(1)(B) (prohibition on harming or killing members of an endangered species). While the Service disagreed, it could not identify any practical consequence of denying the reregistration. Of course, if the registration denial would have no impact, that would implicate our jurisdiction. We ordered supplemental briefing on the question.

The Parties agree that removal of the registration eliminates—among other things—the Society's right to sell or transport its iguanas in interstate commerce. *See* Appellee Supp. Br. 3; Appellant Supp. Br. 2. The Society explains that the elimination of its permit subjects its operations to significant uncertainty, interferes with its educational activities, and prohibits it from recovering the cost of raising these reptiles through sales to other permit holders. Appellant Supp. Br. 2–5. The Service acknowledges that the Society may continue to own, breed, and possess its iguanas without a registration. Appellee Supp. Br. 3.

We start with the export permit. There is no merit to the contention that the Service contradicted itself. [13] When evaluating the Society's reconsideration request, the agency determined that exporting two Noegel stock iguanas (aside two iguanas from Park) would not be "detrimental" to the species. *See* 50 C.F.R. § 23.61. Appellant claims this non-detriment finding precluded the agency from subsequently concluding—during the final administrative appeal—that exporting all four Noegel iguanas would not "reduce the threat of extinction" for the species. *See id*. § 17.22(a)(2)(iv).

Appellant confuses the relationship between the two standards. As we previously mentioned, the "non-detriment" finding turns on whether export will injure the species in the wild. By contrast, whether export will "reduce the threat of extinction" focuses on whether the proposed export will improve the species' prospects. That the former—based on a do no harm principle—is satisfied, does not control the later—requiring an affirmative benefit.

We also reject Appellant's argument that the agency's lack-of-diversity determination diverges from the record. The Society emphasizes that "[i]nbreeding occurs in all iguanids" in the wild. J.A. 181. Therefore, Appellant contends, it was unreasonable to conclude that inbreeding would not affirmatively contribute to the species.

That's a non-sequitur. Because something happens in the wild does not mean it is desirable for the species. Although a

---

[13] Appellant accuses the agency of acting inconsistently despite its own twists and turns. This argument violates our chutzpah doctrine. *See Marks v. Comm'r*, 947 F.2d 983, 986 (D.C. Cir. 1991); *Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 937 n.5 (D.C. Cir. 1991).

researcher for the Cayman Islands Government acknowledged natural inbreeding, he also explained why it was not "too severe" in wild populations. J.A. 181. Of course, "too severe" implies that the researcher assumed the agency's basic premise: Breeding closely related iguanas is not a good idea. This common-sense determination passes muster, particularly in an informal adjudication. *See Menkes v. Dep't of Homeland Sec.*, 486 F.3d 1307, 1314 (D.C. Cir. 2007) ("[I]t is common for the record to be spare" in informal adjudications.).

Appellant similarly claims that this determination is "unsupported by substantial evidence" and thus violates the Administrative Procedure Act. Appellant Br. 26 (citing 5 U.S.C. § 706(2)(E)). But the text of the APA applies "substantial evidence" review only to formal proceedings, not informal adjudications. *Compare Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("The appropriate standard of review" in informal proceedings is "arbitrary, capricious [or] an abuse of discretion . . . as specified in 5 U.S.C. § 706(2)(A).") (internal quotations omitted), *with Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 377 (1998) (applying "'substantial evidence' factual review" in formal adjudications pursuant to § 706(2)(E)).

To be sure, the arbitrary and capricious standard does not substantively differ from the substantial evidence test when "performing [the] function of assuring factual support." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984). But the standards do differ as to the allowable origins of factual support and, as a consequence, how those facts are assessed. *See id.* at 684–85. It is therefore permissible—as with the genetic diversity determination here—for common sense and predictive judgements to be attributed to the expertise of an agency in an informal proceeding, even if not explicitly backed

by information in the record. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009). But formal adjudications (which more typically involve historical facts) require substantial evidence to be found based on the closed record before the agency. *See Data Processing*, 745 F.2d at 684. This subtle difference, as we have previously said, "should not be underestimated." *Id*.

Turning to the captive-bred wildlife registration. The Service was well within its discretion to require additional information before approving the application.

We agree with the district court's conclusion.[14] As the Service rightly argues, "Plaintiff undermined its ability to show legal acquisition by providing at least three different conflicting descriptions of the iguanas that it sought to export and their parental stock." Appellee Br. 26–27; *see also* J.A. 616 (noting the "various explanations" given for the origins of the founder stock). The record shows that the applicant modified the origins of its specimens' ancestors in a manner that just so happens to circumvent the agency's latest objections. In light of that pattern of changing positions, the

---

[14] We hesitate, however, to endorse the district court's rejection of the Blair affidavit as "uncorroborated hearsay," particularly since the agency did not offer this rationale during the adjudication. To be sure, our rules of evidence do not apply in informal adjudications, so an agency may entirely reject, give credit to, or discount the weight of hearsay as appropriate. *See Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 178 (D.C. Cir. 2013). Yet, as records and memories degrade over time, it will become more and more burdensome for permit applicants to prove pre-Act acquisition. And as individuals with personal knowledge of a specimen's importation pass away, nothing but hearsay may remain. One wonders how (or if) this phenomenon might bear on the reasonableness of the agency's requirements.

Service was well within the bounds of its discretion to decline the reregistration absent additional evidence from Appellant. *Cf. Sasol N. Am. Inc. v. NLRB*, 275 F.3d 1106, 1112 (D.C. Cir. 2002) ("[A]n agency's credibility decision normally enjoys almost overwhelming deference.").

That the agency had previously issued a captive-bred wildlife registration to the Society does not change our assessment. An agency may change course so long as that change is reasoned. Here, the Service appropriately acknowledged the prior permits and explained that the inconsistent assertions about the parental stock raised new questions about lawful acquisition.

The judgment of the district court is affirmed.

*So ordered.*