# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 3, 2021    Decided July 20, 2021

No. 20-5189

HUGH CAMPBELL MCKINNEY,
APPELLANT

v.

CHRISTINE WORMUTH, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES ARMY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-00371)

*Seth A. Watkins* argued the cause and filed the briefs for appellant.

*Sean P. Mahard*, Special Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *R. Craig Lawrence* and *Peter C. Pfaffenroth*, Assistant U.S. Attorneys.

Before: SRINIVASAN, *Chief Judge*, RAO, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM:

PER CURIAM: Sergeant First Class (Retired) Hugh McKinney served honorably in the armed forces for more than twenty years. Several years after his retirement, he applied to the Army for a Purple Heart on the ground that he suffered a traumatic brain injury when a roadside bomb exploded near his patrol vehicle in Iraq. The Army denied him a Purple Heart because it found the evidence insufficient to establish that this particular attack caused McKinney to suffer injuries that would qualify for the award. The court recognizes McKinney's years of service and regrets the injuries he sustained during that service. With respect to the award of a Purple Heart, however, we are required to review the Army's decision under a deferential standard. Because the Army did not act arbitrarily or capriciously when it denied McKinney the Purple Heart, we affirm.

I.

The Purple Heart is America's oldest military award. General George Washington established the Purple Heart near the end of the Revolutionary War. *See* U.S. DEP'T OF ARMY, Reg. 600-8-22, MILITARY AWARDS ¶ 2-8*a* (2015) (hereinafter "Army Reg. 600-8-22"). During World War II, the medal became exclusively a recognition of combat injuries and deaths. *See* Decorations, Medals, Ribbons, and Similar Devices, 7 Fed. Reg. 7,477 (Sept. 23, 1942). The Purple Heart "differs from all other decorations" in one aspect: "[A]n individual is not 'recommended' for the decoration; rather, he or she is entitled to it upon meeting specific criteria." Army Reg. 600-8-22 ¶ 2-8*c*. To be eligible for a Purple Heart, a soldier must have suffered an injury resulting from an enemy or hostile act; the injury must have required treatment; and the treatment of the injury by a medical officer must be documented in the soldier's medical record. *See id.* ¶ 2-8*k*.

Most commonly, an injured soldier is submitted for the award by his chain of command. A soldier who "believes that [he is] eligible for the [Purple Heart] but, through unusual circumstances no award was made," may also apply to the Army Human Resources Command. *Id.* ¶ 2-8*j*(2). This application must include corroborating documentation, such as a "narrative describing the qualifying incident" and statements from witnesses "who were personally present, observed the incident, and have direct knowledge of the event." *Id.* ¶ 2-8*j*(2)(*e*) & (*f*). If the soldier's application is denied, he may appeal to the Army Board for Correction of Military Records (the "Board"), which has been delegated the Secretary of the Army's statutory authority to decide when it is "necessary to correct an error or remove an injustice" in any military record. Legislative Reorganization Act of 1946, Pub. L. No. 79-601, § 207, 60 Stat. 812, 837 (codified as amended at 10 U.S.C. § 1552(a)(1)).

McKinney applied for a Purple Heart on the basis that while serving in Iraq he suffered a traumatic brain injury ("TBI"). A TBI is "an injury to the brain resulting from an external force and/or acceleration/deceleration mechanism from an event such as a blast, … which causes an alteration in mental status." J.A. 213. In October 2005, McKinney was on patrol in a Humvee when an improvised explosive device exploded about fifteen to twenty meters away on McKinney's side of the vehicle. The blast struck the Humvee with shrapnel, dirt, and rocks, though none hit McKinney. The vehicle's tactical commander, David Gehrig, believed that McKinney "took the brunt of the blast." J.A. 398. Although everyone in the vehicle "was shaken up and dazed," Gehrig thought that McKinney "was really dazed" and "seemed to not realize [that] the blast had come and gone." J.A. 398. Gehrig later described McKinney as having his "mind … on a loop of the blast for a few minutes." J.A. 398. Despite this initial confusion,

McKinney focused on ensuring the safety of his gunner, whose position in the gun turret left him more exposed to the concussive force of the blast.

After the explosion, McKinney and his fellow soldiers searched for but did not find the insurgents who had placed the bomb. They returned to their base, where McKinney gave a sworn statement regarding the explosion. Military physicians were unavailable at McKinney's base, and McKinney, concerned about putting fellow soldiers in jeopardy on the journey, did not seek to travel to a nearby base for medical attention. McKinney therefore never sought or received a medical evaluation while in Iraq. He completed his deployment and returned to the United States with his unit approximately three weeks later. This October 2005 incident was neither McKinney's first combat mission nor his first encounter with improvised explosive devices: A veteran of more than two hundred combat missions, he had previously been in the vicinity of two other detonations during his deployment.

McKinney retired from the Army in 2007. A few months later, he suffered a stroke at the age of forty-six. A Department of Veterans Affairs doctor, Dr. Robin DeLeon, evaluated McKinney to determine whether his medical conditions were service-connected, which means they were directly caused or made worse by the veteran's military service. Dr. DeLeon concluded that they were. Although he found no clear cause of McKinney's stroke, Dr. DeLeon believed that it was "connected to the [improvised explosive device] exposures." J.A. 413. He later opined that of McKinney's reported exposures, only the October 2005 blast was consistent with causing a TBI. Veterans Affairs affirmed that McKinney had a total disability that was service-connected and permanent, which entitled him to lifetime free medical care and other benefits for 100% disabled veterans.

After receiving these evaluations, McKinney applied to the Army Human Resources Command for a Purple Heart in connection with the October 2005 blast. His attached statement recounted that he "lost consciousness for about 5–10 seconds" after the explosion. J.A. 380. McKinney also relied on the statement from Gehrig, particularly for his description of McKinney's mind being "on a loop" after the blast. J.A. 398. McKinney submitted several medical opinions finding that he had suffered a TBI, though only Dr. DeLeon's tied it definitively to the October 2005 attack.

Human Resources Command requested that an Army doctor, Dr. Michael Sullivan, review McKinney's medical records. Dr. Sullivan concluded that, although "[t]here is no doubt … that [McKinney] was exposed to concussive forces, his TBI appears to be a cumulative [e]ffect as opposed to being caused by a specific event." J.A. 370. Human Resources Command denied the application, explaining that McKinney failed to provide sufficient documentation that he received treatment in connection with a TBI caused by the October 2005 attack. McKinney requested reconsideration, and Human Resources Command again denied his request.

McKinney appealed to the Board. As the applicant, McKinney had the burden of overcoming a "presumption of administrative regularity" by "proving an error or injustice by a preponderance of the evidence." 32 C.F.R. § 581.3(e)(2). The Board must deny an application "when the alleged error or injustice is not adequately supported by the evidence." *Id.* § 581.3(b)(4)(iv).

The Board determined that McKinney did not qualify for a Purple Heart. It found there was no evidence that McKinney "was treated by medical personnel for an injury/wound he received as a result of hostile action on or near 9 October

2005." J.A. 347. Neither McKinney's statement made a few days after the blast nor Gehrig's statement indicated that McKinney was wounded; Gehrig indicated only that McKinney was dazed. The Board also relied upon Dr. Sullivan's conclusion that McKinney's TBI was caused by the cumulative effect of "multiple concussive forces," not a specific event. J.A. 348.

McKinney filed a claim under the Administrative Procedure Act ("APA") in the District Court for the District of Columbia, alleging the Board's action was arbitrary and capricious. The court granted summary judgment to the Army. After assessing the medical evidence, the district court held it was not arbitrary or capricious for the Army to deny the award because McKinney failed to establish that his injury would have required treatment by a medical officer. McKinney timely appealed.

## II.

This court has exercised jurisdiction to review a denial of a Purple Heart award. *Cf. Haselwander v. McHugh*, 774 F.3d 990, 996 (D.C. Cir. 2014). Under the APA, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. The Board's decision to deny an application constitutes final agency action. 32 C.F.R. § 581.3(g)(2)(i)(A).

Several principles guide the relevant standard of review. First, we review the district court's grant of summary judgment de novo. *See Kidwell v. Dep't of the Army*, 56 F.3d 279, 286 (D.C. Cir. 1995). Second, the Board's actions in correcting military records will be set aside "if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Haselwander*, 774 F.3d at 996 (quoting

5 U.S.C. § 706(2)(A)). Third, the Board's decision must demonstrate reasoned decisionmaking. *See id.*

Our review of Board decisions involves "an unusually deferential application of the 'arbitrary or capricious' standard." *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989). Because of the Secretary's broad statutory discretion, "[i]t is simply more difficult to say that the Secretary has acted arbitrarily if he is authorized to act '*when he considers it necessary* to correct an error or remove an injustice.'" *Id.* (quoting 10 U.S.C. § 1552(a)) (emphasis in original). Moreover, we cannot lose sight of the fact that "'[j]udges are not given the task of running the Army,'" so our review asks only if the Board's decisionmaking "process was *deficient*, not whether [its] decision was *correct*." *Id.* at 1511 (quoting *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953)) (emphasis added).

The parties suggest that the Board's decision here must also be supported by substantial evidence. But that standard of review applies only to formal adjudications. 5 U.S.C. § 706(2)(E); *Phoenix Herpetological Soc'y v. U.S. Fish & Wildlife Serv.*, 998 F.3d 999, 1005 (D.C. Cir. 2021). The Board's adjudication of a denial of a Purple Heart is informal and so that standard does not apply here.[1] We review the

---

[1] Congress sometimes specifies by statute that a particular informal adjudicatory decision be supported by substantial evidence. Adjudications to correct a military record must be supported by substantial evidence if the Board adjudicating the claim has been "designated as a special board by the Secretary." 10 U.S.C. § 1558(b)(1)(A) & (B); *id.* § 1558(f)(3)(B). The record contains no evidence that the Secretary designated the Board reviewing McKinney's application as a special board, nor do the parties suggest that such a designation was made.

8

Board's informal adjudication under the arbitrary and capricious standard.

III.

To qualify for a Purple Heart, McKinney had to establish three elements: (1) that he received a qualifying injury; (2) that the injury required treatment by a medical officer; and (3) that the medical treatment was documented in his records. Army Reg. 600-8-22 ¶ 2-8*k*.

Not all injuries received during military service qualify for a Purple Heart. As relevant here, a "[m]ild traumatic brain injury or concussion" qualifies only if it was "severe enough to cause either loss of consciousness or restriction from full duty due to persistent signs, symptoms, or clinical finding, or impaired brain function for a period greater than 48 hours from the time of the concussive incident." *Id.* ¶ 2-8*g*(6). But a mild TBI that "do[es] not either result in loss of consciousness or restriction from full duty for a period greater than 48 hours due to persistent signs … of impaired brain function" does not qualify for the Purple Heart. *Id.* ¶ 2-8*h*(13).

Although it is undisputed that McKinney suffered a TBI because of his military service, the Board reasonably determined that McKinney did not demonstrate a qualifying injury caused by the October 2005 attack. It relied on McKinney's thorough statement from the day after the explosion, in which he did not state that he lost consciousness, report any symptoms of impaired brain function, or indicate he was otherwise injured in the blast. Crediting this contemporaneous statement, rather than McKinney's later recollections, was neither arbitrary nor capricious. Moreover, Gehrig, McKinney's only witness, did not indicate that

McKinney was injured following the incident, only dazed. Being dazed would not qualify for a Purple Heart.

In the same vein, we think the Board's determination that McKinney's TBI resulted from a cumulative effect, as opposed to the October 2005 attack, was reasonable. McKinney relies on Dr. DeLeon's assessment that the October 2005 attack caused McKinney's TBI and led to his subsequent stroke. The Board's decision takes account of that assessment, but it credited Dr. Sullivan's subsequent opinion that cumulative exposures caused his TBI. The Board therefore "reasonably reflect[ed] upon the information contained in the record and grapple[d] with contrary evidence." *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017). Because the Board complied with these standards, we cannot second-guess its decision. The Board permissibly found the evidence lacking that McKinney received a qualifying injury in the October 2005 attack, so we need not address McKinney's arguments as to the second and third requirements.

McKinney also faults the Board for its brief analysis. The analysis, however, has sufficient clarity for us to discern the Board's rationale. *See Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) ("[A]n agency's decision [need not] be a model of analytic precision to survive a challenge."). This is not a case in which the Board simply inserted "boilerplate language" or "parrot[ed] the language" of the governing regulation "without providing an account of how it reached its results." *Id.* at 1405. On the contrary, the Board's decision here, while concise, satisfies the APA's requirement to "minimally contain a rational connection between the facts found and the choice made." *Id.* at 1404 (cleaned up). The Board's decision meets that minimal standard.

\* \* \*

Sergeant First Class (Retired) McKinney sacrificed a great deal in service to the Nation. This decision in no way detracts from his honorable service or discounts the severity of his medical problems in the years since his retirement. In deciding this case, however, the court is limited to considering the reasonableness of the Board's decision. Under these standards we affirm the judgment of the district court.

*So ordered.*