# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Decided February 24, 2022

No. 22-1011

IN RE: NTE CONNECTICUT, LLC,
PETITIONER

ISO NEW ENGLAND INC.,
INTERVENOR

———

On Petition for an Emergency Stay Pursuant to the All Writs
Act

———

*David W. DeBruin, Suedeen G. Kelly*, and *Zachary B. Cohen* were on the petition and the reply.

*Matthew R. Christiansen*, General Counsel, Federal Energy Regulatory Commission, *Robert H. Solomon*, Solicitor, *Beth G. Pacella*, Deputy Solicitor, and *Matthew W.S. Estes*, Attorney, were on the response to the petition.

Before: WILKINS, RAO and JACKSON, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

Dissenting opinion filed by *Circuit Judge* WILKINS.

RAO, *Circuit Judge*: Petitioner NTE Connecticut, LLC ("NTE") acquired valuable authorization to sell electricity

from its new power plant. The Federal Energy Regulatory Commission ("FERC") revoked that authorization and, in so doing, very likely fell short of its obligation under the Administrative Procedure Act ("APA") to explain the reason for its decision. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Absent emergency relief from this court, FERC's order would have irreparably harmed NTE, preventing it from participating in a February 7, 2022, auction to sell future electricity capacity to New England consumers. On February 4, 2022, we granted NTE's petition for an emergency stay of FERC's order, with an opinion to follow. This is that opinion.

I.

A.

For the past seven years, NTE has been working to build a new natural gas fueled power plant in Killingly, Connecticut. In order to sell electricity on the New England grid, NTE had to work with ISO New England Inc. ("ISO-NE") to have the project "qualified." ISO-NE is the independent system operator authorized by FERC to manage the regional grid. ISO-NE oversees annual "forward capacity auctions" at which the owners of generation facilities bid for the right to sell electricity on the grid in the future. *See NextEra Energy Res., LLC v. FERC*, 898 F.3d 14, 17 (D.C. Cir. 2018) (describing this process). The right to provide "capacity" (i.e., the ability to produce electricity), in the quantity and at the price fixed at auction, is called a facility's "capacity supply obligation" ("CSO"). The CSO is tied to a one-year "capacity commitment period" that begins three years after the auction. In concrete terms, a generation facility awarded a CSO at the 2022 auction gains the right to sell electricity for one year beginning June 1,

2025. A facility with a CSO is automatically "qualified" to participate in future ISO-NE auctions.

After locating a suitable parcel of land, designing the facility, and preparing a timeline for the project's financing and construction, NTE applied to have the Killingly plant "qualified." ISO-NE approved the application, and in the 2019 auction NTE secured a CSO for the 2022 commitment period. Under ISO-NE's rules at the time, a newly qualified facility was permitted to "lock in" the terms of its initial CSO for six subsequent capacity commitment periods (i.e., for seven years total). *See ISO New England Inc.*, 173 FERC ¶ 61,198 at PP 2–4 (2020). NTE exercised this option, giving it a guaranteed income stream for the first seven years of the Killingly plant's operation, which in turn made it more attractive to potential investors. NTE thereafter participated in the 2020 and 2021 auctions, securing contract rights to supply electricity for the 2023 and 2024 commitment periods.

Initially, NTE had planned for the Killingly facility to come online in early 2022. But soon after securing its first CSO in 2019, NTE encountered a series of setbacks that prevented it from meeting its financing and construction goals. First, just after the 2019 auction, incumbent energy generators in New England asked FERC to review ISO-NE's qualification of the Killingly plant, placing NTE's CSO in jeopardy. FERC eventually upheld NTE's rights, but the results of the 2019 auction did not become final until September 2019. Second, while the incumbent competitors' challenge was pending before FERC, several environmental groups sued in state court to block the Connecticut Siting Council's decision to approve the Killingly plant. One of them, a nonprofit called Not Another Power Plant, appealed the case to the Connecticut Supreme Court, which did not issue a decision in NTE's favor until September 2021—some thirty-one months after the 2019

auction. *See Not Another Power Plant v. Conn. Siting Council*, 265 A.3d 900 (Conn. 2021). In the interim, NTE had located a potential investor for the Killingly plant. But because the project's viability depended on a favorable legal ruling, NTE was unable to finalize financing while the case was under review. Third, the arrival of the COVID-19 pandemic in early 2020 caused further complications. Disruptions to supply chains and labor markets required NTE and its potential investor to frequently recalculate the project's shifting costs, while pandemic related delays slowed NTE's ability to secure necessary construction permits. Because of these obstacles, NTE was repeatedly forced to revise its timeline for the Killingly plant's construction.

If the Killingly plant was not operational by May 31, 2024, ISO-NE had the right to request that FERC terminate NTE's existing CSO, disqualifying it from participating in future auctions. ISO-NE Tariff § III.13.3.4A.[1] By September 2021, ISO-NE was concerned that NTE was running out of time to meet that deadline. As revised, NTE's timetable required it to finalize equity financing for the Killingly plant in mid-January 2022, to finalize debt financing in early March 2022, and to begin commercial operation of the plant on May 31, 2024. NTE also planned to issue full notices to proceed to its contractors by January 1, 2022, before financing was finalized.

ISO-NE hired a consultant to assess whether these plans were feasible. After reviewing NTE's timeline and conferring with the parties, the consultant concluded that if NTE issued full notices to proceed by January 1, 2022, "commercial

---

[1] "[I]f, as a result of milestone date revisions, the date by which a resource will have achieved [operations] is more than two years after the beginning of the Capacity Commitment Period for which the resource first received a [CSO]," ISO-NE may request that FERC terminate the resource's CSO. ISO-NE Tariff § III.13.3.4A.

operation of [the Killingly plant] could occur on or about the stated proposed commercial operation date of May 31, 2024." Issuing full notices on January 1, 2022, would give NTE twenty-nine months to build the Killingly facility—"an aggressive, but achievable schedule for a project of this scope." However, according to the consultant, full notices to proceed typically cannot be issued before financing is secured. NTE's "assumption" that it would be able to issue full notices by January 1, 2022, was therefore "unlikely." Under a more "realistic scenario," the consultant concluded, NTE would be able to issue full notices only after securing financing in mid-January, resulting in a "likely commercial operation date" beyond the deadline of May 31, 2024.

On November 4, 2021, shortly after receiving the consultant's report, ISO-NE met with NTE to review its plans for the Killingly plant. At the meeting, NTE told ISO-NE that it remained confident it could complete construction on time. It also produced a letter from its equity investor, indicating that the investor would soon be ready to issue full notices to proceed to major contractors and that those notices did not depend on finalizing the project's financing details with NTE.

B.

Later that same day, ISO-NE asked FERC to terminate the Killingly plant's CSO. Such a termination would have voided NTE's rights to collect revenues for the 2022, 2023, and 2024 commitment periods. It would also have made NTE ineligible to participate in the 2022 capacity auction, depriving NTE of the "locked in" CSO for the 2025 commitment period.

ISO-NE claimed that because of NTE's timeline changes, the Killingly facility would not achieve commercial operation by the May 31, 2024, deadline. In support of this claim, ISO-NE provided FERC with NTE's most recent construction

timeline, ISO-NE's consultant's report, and the letter from NTE's equity investor. NTE's timeline, ISO-NE observed, "indicates that NTE will issue full notices to proceed on January 1, 2022[,] … [which] assumes that those notices can be issued without financing in place"—an assumption that ISO-NE, relying on its consultant, rejected. Because "it is unlikely that these notices to proceed will be executed without financing in place," ISO-NE argued, NTE "will be unable to achieve commercial operation of Killingly" by the deadline.

In response, NTE explained that the assumption on which ISO-NE and its consultant relied—that NTE would not be able to issue full notices to proceed until its equity financing was in place in mid-January—was erroneous. At the time of ISO-NE's filing, NTE's investor had expected to approve the transaction in December 2021 and was willing to issue full notices to contractors *before* financing was finalized, allowing NTE to meet the January 1, 2022, target. ISO-NE had failed to recognize, in other words, that NTE's project had a unique financing structure. NTE provided FERC with a declaration from the Killingly plant's lead developer, explaining that NTE and its investor had agreed to issue full notices before financing closed and that the parties had been on track to do so by January 1, 2022. NTE also submitted a declaration from the project's lead contractor, indicating that if full notices to proceed had been issued on schedule, "it would have been feasible to complete the project by May 31, 2024." NTE further argued that ISO-NE had not "met its burden … to show that Killingly will not enter service by June 1, 2024," but had "only speculate[d] that Killingly will not meet the … deadline, which is not the objective standard required by the Tariff." *ISO New England Inc.*, 178 FERC ¶ 61,001 at P 19 (2022) (describing NTE's argument).

On January 3, 2022, FERC issued an order terminating Killingly's CSO, which stripped NTE of its existing right to provide electricity generation capacity for the 2022, 2023, and 2024 commitment periods, and which barred it from participating in the 2022 auction—effectively nullifying NTE's vested right to generation revenues for the 2025 commitment period. *See id.* P 23. After recounting some of the parties' arguments, FERC concluded that, "[b]ased on a review of the record, including the confidential information provided by ISO-NE and NTE, … the relevant condition for termination set forth in [ISO-NE's] Tariff … has been met." *Id*. P 25. FERC's only reason for this conclusion was that it was "persuaded by the evidence provided by ISO-NE that, the milestone date revisions indicate that Killingly will not have achieved … commercial operation[] until after June 1, 2024." *Id.* P 26. In a footnote, FERC asserted that "[b]ecause much of the pertinent information has been filed on a non-public basis, this public order cannot go into detail regarding the specifics of the triggering event or the basis for ISO-NE's judgment that Killingly will not be able to achieve … commercial operations by June 1, 2024 as required by the tariff. Our review of these non-public materials, however, satisfies us that this is the case." *Id.* P 26 n.39.

NTE filed a combined emergency motion for a stay and application for rehearing before FERC on January 10, 2022. NTE argued that it would be irreparably injured without a stay of FERC's termination order: it would lose its right to future revenues under Killingly's existing CSO and would be ineligible to participate in the upcoming 2022 auction. Together, it alleged, these penalties would effectively kill the project. FERC denied NTE's motion for a stay on January 28, 2022. *See ISO New England Inc.*, 178 FERC ¶ 61,063 (2022). FERC reasoned that, because "economic loss does not constitute irreparable harm," the "[l]oss of potential capacity

market revenues … [was] insufficient" to warrant a stay. *Id.* PP 14, 16. It further found that NTE's assertion that its order had "effectively killed" the Killingly project was too speculative to support a finding of irreparable harm. *Id.* PP 5, 16. FERC did not respond to NTE's request for rehearing and had not done so at the time of our decision in this case.

NTE filed a petition for emergency relief in this court, asking us to stay FERC's order until thirty days after FERC addresses NTE's application for rehearing. It requested that we decide its petition in time for NTE to participate in the 2022 auction, to be held on February 7, 2022. For the reasons outlined below, we granted that petition on February 4.

II.

The All Writs Act gives this court the power to "issue all writs necessary or appropriate in aid of [its] … jurisdiction[]." 28 U.S.C. § 1651(a). In an ordinary FERC case, we have jurisdiction only after the agency issues a final order on rehearing, *see* 16 U.S.C. § 825*l*(b), or after thirty days have lapsed from a party's application for rehearing, *see id.* § 825*l*(a). But this court has an "inherent" power under the All Writs Act to stay agency action in order to preserve its prospective jurisdiction. *See Nken v. Holder*, 556 U.S. 418, 427 (2009) (explaining that this authority is "firmly imbedded in our judicial system, consonant with the historic procedures of federal appellate courts, and a power as old as the judicial system of the nation") (cleaned up); *see also Reynolds Metals Co. v. FERC*, 777 F.2d 760, 762 (D.C. Cir. 1985).

At the time NTE petitioned this court for relief, FERC had not acted on NTE's application for rehearing, nor had the requisite thirty days lapsed since NTE's application for rehearing. All parties agreed, therefore, that we could not stay FERC's order under the Federal Power Act's ordinary

provisions for judicial review. At the time we granted NTE's request for a stay, however, our prospective jurisdiction was certain: if FERC did not publish a rehearing order addressing NTE's objections, we would have jurisdiction after thirty days to review a petition from NTE. We therefore had the authority to consider NTE's petition for emergency relief. *See Am. Pub. Gas Ass'n v. Fed'l Power Comm'n*, 543 F.2d 356, 357–58 (D.C. Cir. 1976) (per curiam) ("[T]he authority of the appellate court is not confined to the issuance of writs in aid of a jurisdiction already acquired by appeal but extends to those cases which are within its appellate jurisdiction although no appeal has been perfected.") (cleaned up).

"[R]elief under the All Writs Act is an extraordinary remedy that may be invoked only if the statutorily prescribed remedy is clearly inadequate." *Reynolds*, 777 F.2d at 762 (cleaned up). When an agency's order is "not yet final, [such that] no direct appeal from it yet [lies], and a stay pending appeal [is] not available to prevent irreparable injury," the aggrieved party lacks an adequate statutory remedy. *Id.* NTE and FERC agreed that, absent relief from this court, NTE would have been unable to participate in the 2022 capacity auction. NTE alleged that such a result would have led to an irreparable injury: its Killingly plant would have been deprived of a CSO for the 2025 commitment period that is worth "millions of dollars" and that could not be recovered after the auction. Further, because FERC had not acted on NTE's application for rehearing before the February 7 auction, NTE was precluded from petitioning for direct judicial review of the order or a judicial stay pending such review. NTE therefore satisfied the "preliminary condition distinctive to All Writs relief." *Id.*

Accordingly, we must next decide whether NTE has satisfied the "well established requirements that we routinely

apply to motions for stay pending appeal." *Id.* We must consider "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (cleaned up).[2]

## A.

We begin with NTE's likelihood of success on the merits. NTE alleged that the termination order was arbitrary and capricious because FERC did not explain why it adopted ISO-NE's argument for termination and ignored NTE's arguments to the contrary. FERC's orders will be "set aside" if they are "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A); *see United Airlines, Inc. v. FERC*, 827 F.3d 122, 127 (D.C. Cir. 2016). While FERC's order need not be "a model of analytic precision to survive a challenge," *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995), it must be "reasonable and reasonably

---

[2] This court has characterized various requests for relief under the All Writs Act as petitions for mandamus, and our order granting NTE's petition reflected that practice. Strictly speaking, however, NTE has not asked for a writ of mandamus—it does not ask us to compel FERC to take some action—but for a stay of FERC's order to preserve the status quo. *See Nken*, 556 U.S. at 426–27 (distinguishing a stay pending further agency review from an affirmative order to the Executive Branch to act). As explained above, when a party requests a stay under the All Writs Act and "the statutorily prescribed remedy is clearly inadequate," we evaluate the petition for relief like an ordinary application for a stay. *Reynolds*, 777 F.2d at 762 (cleaned up). To avoid confusion, with the publication of this opinion we also revise the February 4 order to remove the reference to mandamus and to clarify that we granted an emergency petition for a stay pursuant to the All Writs Act.

explained," *Nw. Corp. v. FERC*, 884 F.3d 1176, 1179 (D.C. Cir. 2018). Because FERC's termination order almost certainly fell short of these requirements, NTE had a substantial likelihood of success on the merits.

First, FERC's order did not provide a "reasoned explanation" of the decision to terminate Killingly's CSO. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). Indeed, FERC hardly provided any reason at all. Its termination order simply summarized some of the parties' arguments in broad strokes and then announced, without elaboration, that FERC was "persuaded by the evidence provided by ISO-NE that … Killingly will not [become operable] until after June 1, 2024." *ISO New England*, 178 FERC ¶ 61,001 at P 26. The order gives no explanation of *why* FERC found ISO-NE's evidence persuasive. FERC was entitled to reach that conclusion (if the record supported it, of course, *see* 5 U.S.C. § 706(2)(E)). But it could not simply rubberstamp ISO-NE's analysis, especially since ISO-NE bore the burden below. As we held in a similar case, an agency's "unquestioning reliance" on a third party's "defense of its own actions is not enough" to survive an arbitrary and capricious challenge. *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017) (considering agency reliance on a self-regulatory organization). An agency must either "critically review[]" the third party's analysis or "perform[] its own." *Id.* Here, FERC did neither.

In place of such reasons, FERC cryptically asserted that it could not explain its decision because "much of the pertinent information [was] filed on a non-public basis." *ISO New England*, 178 FERC ¶ 61,001 at P 26 n.39. In the first instance, it is unclear why, if confidentiality concerns prevented FERC from publishing a more complete analysis, it could not simply redact its order before public release, as federal courts routinely

do, and as FERC has done in the past. *See, e.g.*, *White Cliffs Pipeline, LLC*, 168 FERC ¶ 63,033 (2019), *aff'd*, 173 FERC ¶ 61,155 (2020). More fundamentally, we reject the premise that if a matter implicates confidential information an agency is somehow absolved of its responsibility to explain its decision. It is "inherent in the doctrine of judicial review" that an agency must "articulate with clarity and precision its findings and the reasons for its decisions." *WAIT Radio v. FCC*, 418 F.2d 1153, 1156 (D.C. Cir. 1969). We see no reason here to depart from the bedrock principle that, "in all cases, the Commission must explain its reasoning." *Emera Me. v. FERC*, 854 F.3d 9, 23 (D.C. Cir. 2017) (cleaned up). The APA does not contain a confidentiality loophole.

Nor did FERC acknowledge, let alone reasonably reject, NTE's central argument against termination—namely, that its plan to issue full notices to proceed by January 1, 2022, was viable, and that ISO-NE's assertion to the contrary was unsupported by the record. ISO-NE's argument for termination was expressly predicated on the very assumption that NTE contested. Moreover, NTE submitted additional evidence to FERC supporting the viability of its construction timeline and explaining its project's unique financing structure, which allowed full notices to be issued before the financing was finalized. Again, FERC was entitled to conclude that NTE's evidence was unpersuasive or that its timeline was unfeasible for other reasons. But it could not simply ignore NTE's central objection to ISO-NE's analysis.[3] "An agency's failure to

---

[3] The dissent faults NTE for submitting new evidence to FERC that was not previously considered by ISO-NE. But there is no dispute that the evidence was properly before FERC. The fact that evidence on a key point of dispute was previously unaddressed by ISO-NE only accentuates FERC's obligation to provide independent analysis. The dissent denigrates NTE's submissions as "eleventh hour, self-

respond meaningfully to objections raised by a party renders its decision arbitrary and capricious. We have stressed that unless the agency answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned." *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (cleaned up). FERC's failure to address NTE's facially legitimate arguments was especially concerning given that its decision upended the status quo ante, threatening to deprive NTE of "millions of dollars" of future revenues to which it had been entitled.

Second, FERC failed to articulate a discernable legal standard under ISO-NE's Tariff to govern the termination of NTE's valuable right to a CSO for the 2025 commitment period. As the party moving to terminate the CSO, ISO-NE bore the burden of showing why the Tariff's conditions for termination were met. *See* 5 U.S.C. § 556(d) ("Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof."); *cf. Ala. Power Co. v. FERC*, 993 F.2d 1557, 1571 (D.C. Cir. 1993) ("[T]he party filing a rate

---

serving, uncorroborated hearsay." Even if the dissent's criticisms were fair, FERC did not make them but merely ignored NTE's submissions. And although we are permitted and indeed required to look at the administrative record when evaluating APA challenges, that does not excuse FERC from its duty to explain the reasons for its actions. Nor does it justify this court making what are effectively de novo evidentiary determinations about the credibility or weight of the evidence. *See, e.g.*, *Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 998 F.3d 999, 1006 n.14 (D.C. Cir. 2021) ("We hesitate … to endorse the district court's rejection of the … affidavit as 'uncorroborated hearsay,' particularly since the agency did not offer this rationale during the adjudication.").

We further note that FERC has not been ambushed by arguments it did not have a chance to consider. The agency had weeks to respond to NTE's application for rehearing, which raised the same arguments considered by the court in granting this stay.

adjustment with the Commission under [Section] 205 bears the burden of proving the adjustment is lawful."). In addition, ISO-NE bore the burden of showing that termination of NTE's CSO was "just and reasonable." 16 U.S.C. § 824d(a), (e); *see, e.g., ISO New England Inc.*, 165 FERC ¶ 61,137 at P 31 (2018).

The Tariff, however, does not explicitly state the standard that ISO-NE must satisfy to justify termination. The Tariff permits ISO-NE to request termination "if, *as a result of milestone date revisions*, the date by which a resource will have achieved [commercial operation] is more than two years after the beginning of [its first] Capacity Commitment Period." ISO-NE Tariff § III.13.3.4A (emphasis added). Under these terms, must ISO-NE show that, "as a result of milestone date revisions," it will be *impossible* for NTE to meet its deadline? Do the new milestone dates have to make timely completion *unlikely*? Is there some other standard? FERC's failure to identify the burden that ISO-NE was required to carry further supports the conclusion that FERC did not adequately explain why it was satisfied in this case.

ISO-NE's consultant found that NTE's construction timeline was "aggressive, but achievable." In other words, if NTE had issued full notices to proceed by January 1, 2022, commercial operation of the plant by May 1, 2024, was at least possible. FERC's laconic order gives no indication of how ISO-NE could meet its burden under the Tariff given the consultant's finding. Perhaps FERC simply did not believe NTE would meet its own deadlines, but even if FERC relied on that credibility finding, it needed to explain its conclusion. The Tariff does not expressly give ISO-NE the right to terminate a CSO simply because it believes the facility's developer will not meet its otherwise acceptable milestone dates. Rather, the CSO is a valuable allocation of rights to provide electricity, and ISO-NE must request that FERC terminate it. FERC, in turn, must

comply with the APA's rationality requirements and find the termination of such rights "just and reasonable."

Were this order before us on direct review, we would very likely find it unreasoned, and therefore unlawful. Indeed, FERC concedes that it provided an "admittedly limited explanation in the Termination Order." Without further explanation, we had no reason to believe that FERC reasonably exercised its discretion. We therefore found that NTE is almost certain to succeed in its challenge to FERC's termination order.

B.

We next consider whether NTE faced irreparable harm in the absence of a stay. *Nken*, 556 U.S. at 434. As a result of FERC's termination order, NTE would have been ineligible to participate in the 2022 capacity auction. But before FERC issued its order, NTE was guaranteed to secure a CSO at the 2022 auction, entitling it to provide the same amount of capacity, at the same price, that it secured in the 2019 auction. This future revenue stream is worth "millions of dollars," and FERC does not dispute that it is significant.

Ordinarily, "economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). That is because in most circumstances financial harms can be remedied through subsequent legal action. *See id.* Nonetheless, we have recognized that "financial injury [can be] irreparable where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wis. Gas Co.*, 758 F.2d at 674).

This is such a case. If NTE had been barred from the 2022 auction, the capacity rights to which it was formerly entitled would have been allocated to other generators on the New England grid. Given the reliance interests involved, FERC does not generally direct entities like ISO-NE to vacate the results of earlier auctions and rerun them to include new entrants. *See PJM Interconnection, LLC*, 161 FERC ¶ 61,252 at P 55 (2017) ("The Commission generally does not order a remedy that requires rerunning a market [auction] because market participants … expect[] that the rules in place and the outcomes will not change after the results are set."). If NTE had been excluded from the auction and FERC's order were later found to be unlawful, the capacity that NTE would have received at the 2022 auction could not later be clawed back. Without the capacity allocation, it is unlikely that NTE would have had a claim to lost revenue streams. FERC has made no representation to the contrary, and we are aware of no other mechanism through which NTE could have recovered these losses.

The circumstances and timing here are unusual because, in order to realize its vested contractual rights, NTE had to take part in a regulatory auction with other participants. Absent emergency relief, FERC's termination order would have irreparably and permanently stripped NTE of very significant future revenues to which it was entitled before FERC issued its (likely unlawful) order.

## C.

Next we consider "whether issuance of the stay will substantially injure the other parties interested in the proceeding" and balance the equities. *Nken*, 556 U.S. at 434 (cleaned up). As explained above, our emergency stay permitted NTE to participate in the 2022 ISO-NE auction and

to acquire a CSO for the Killingly plant for the 2025 commitment period. The stay also paused FERC's termination of NTE's already acquired CSO for the commitment periods running from June 1, 2022, to May 31, 2025.

FERC pointed to possible third-party harms that may befall incumbent electricity generators. Specifically, it asserts that NTE's participation in the 2022 auction would provide additional energy supply in the region, driving down electricity costs on the New England grid in the 2025 commitment period. Because of our stay, incumbent generators would accordingly be paid less for the electricity they generate and would be able to sell less overall capacity. Such third-party harm, however, will be short-lived if FERC's order is sustained in the future, because the capacity NTE secured at the 2022 auction can be reallocated among existing facilities through a "reconfiguration auction." FERC does not contest the feasibility of such a limited reauction.

Finally, we must decide "where the public interest lies." *Id.* NTE's participation in the 2022 auction was expected to lower energy costs for New England consumers by generating more supply and competition in the electricity market. One goal of a forward capacity auction is to "incentivize and account for new entry by more efficient generators, while ensuring a price both adequate to support reliability and fair to consumers." *NextEra*, 898 F.3d at 20 (cleaned up). Our temporary stay pending agency rehearing simply ensured that FERC did not impose unrecoverable losses of millions of dollars and potentially jeopardize a new facility without fulfilling the basic requirements of reasoned explanation.

FERC protested that to permit NTE to participate in the 2022 auction, even though the Killingly facility will not be able to provide electricity in the relevant commitment period, would

distort market competition and "undermine the basic functioning of [ISO-NE's] capacity market, including its ability to send accurate price signals to guide entry and exit." As the facts here demonstrate, however, entry and exit into the electricity market hardly moves at a rapid pace. And entities like ISO-NE regularly reallocate capacity if a facility is unable to fulfill its commitments, allowing for a correction of any market distortion. More to the point, nothing in FERC's reasoning suggests the risk that incumbents may have to reallocate electricity capacity amongst themselves outweighs the harm of delaying NTE's years-long electricity infrastructure project that could benefit consumers in the region through more efficient (i.e., less expensive) electricity.

\* \* \*

For the foregoing reasons, we granted NTE's petition to stay FERC's termination order until thirty days after FERC resolves the pending application for agency rehearing.

WILKINS, *Circuit Judge*, dissenting: Because I believe that the petition for relief should have been denied, I dissent.

To demonstrate entitlement to relief, the first and foremost consideration is "'whether the stay applicant has made a *strong showing* that he is likely to succeed on the merits[.]'" *Nken v. Holder*, 556 U.S. 418, 434 (2009) (emphasis added) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). In addition, we must consider whether NTE has shown that it will suffer irreparable harm absent a stay, whether a stay will substantially injure other parties and whether a stay is in the public interest. *Nken*, 556 U.S. at 434. The public interest and balance of equities factors merge when, as here, the government is the opposing party. *Id.* at 435. In my view, NTE failed to meet its burden of making a "strong showing" that it is likely to succeed on the merits, which in turn undermines its showing that the public interest and balance of equities support a stay. *See Hilton*, 481 U.S. at 776; *cf. Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) ("A party's likelihood of success on the merits 'is a strong indicator that a preliminary injunction would serve the public interest' because '[t]here is generally no public interest in the perpetuation of unlawful agency action.'") (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

Prior to the agency action under review, NTE had delayed the date for Killingly's financing milestone fourteen times, resulting in multiple delays of the expected commercial operating date of the power plant. In January of 2021, FERC warned NTE that ISO-NE had a duty under the Tariff "to monitor Killingly's critical path schedule," and that further delays in financing milestones could result in ISO-NE exercising its right to seek termination of NTE's CSO. *ISO New England, Inc.*, 174 FERC ¶ 61,046 P 40 & n.63 (2021). As FERC explained, the Tariff permits ISO-NE to seek termination of NTE's CSO if, as a result of milestone date revisions, "the date by which [NTE] will achieve all critical

path schedule milestones is more than two years after the beginning of the first Capacity Commitment Period for which it acquired a CSO." *Id*. at n.63.

Because NTE's subsequent reports indicated further financing delays, ISO-NE hired an expert consultant "to assist in reviewing Killingly's critical path schedule." ISO-NE Term. Filing 6. The consultant's report was not favorable for NTE. As ISO-NE explained, "[the consultant's] review supports that the date by which Killingly will achieve all its critical path schedule milestones is more than two years after the beginning of the Capacity Commitment Period for which Killingly first received a CSO." *Id.* ISO-NE therefore asked FERC to accept its request to terminate NTE's CSO.

FERC accepted ISO-NE's termination filing. FERC explained that it agreed with ISO-NE's assessment of the evidence:

> We are persuaded by the evidence provided by ISO-NE that, the milestone date revisions indicate that Killingly will not have achieved all of its critical path schedule milestones, including commercial operation, until after June 1, 2024, i.e., more than two years after June 1, 2022—the beginning of the 2022-2023 Capacity Commitment Period.

*ISO New England, Inc.*, 178 FERC ¶ 61,001 P 26 (2022). As FERC explained, the consultant's report, which is in the record, supported ISO-NE's conclusion. *Id*. at PP 25–26.

FERC's explanation was sufficient. "Our only task is to determine whether the Commission has considered the relevant factors and articulated a rational connection between the facts

found and the choice made." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc*., 462 U.S. 87, 105 (1983). This is a "'narrow' standard of review[.]" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The instances where we have set aside agency action for insufficient explanation are where the explanation was "neither logical nor rational," "[in]coherent," "incomprehensible," or where the agency completely failed to explain inconsistencies with the governing statute, its prior precedent, or the evidence. *NBCUniversal Media, LLC v. NLRB*, 815 F.3d 821, 823 (D.C. Cir. 2016); *see CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 416 (D.C. Cir. 2011).

None of those circumstances are present here. NTE does not seriously contend that the expert consultant's report did not constitute substantial evidence to support FERC's Order, nor could it. The best argument that NTE can muster is that FERC did not set forth in detail why it accepted the consultant's report over NTE's interpretation of the evidence. But that argument hardly presents a "strong showing" of success. *See Hilton*, 481 U.S. at 776. First, the FERC Order explained the competing arguments made by NTE and ISO-NE in some detail, 178 FERC ¶ 61,001 at PP 12–19, so there is no question here that FERC considered NTE's arguments and all the record evidence. Furthermore, FERC's Order need not be "a model of analytic precision to survive a challenge," *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995), and we may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (citations and internal quotation marks omitted).

FERC's reasoning is discernible because FERC explained that it agreed with ISO-NE's analysis of the

evidence.  Furthermore, we can look at the reasoning appearing in the text of the ISO-NE Order to help us discern FERC's path.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (directing the lower court to examine the record that was before the agency at the time of decision to determine whether it "disclose[d] the factors that were considered"); *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 738 (D.C. Cir. 2001) (considering contemporaneous agenda memoranda in the record because they illuminate the "agency's decisionmaking rationale").  ISO-NE rejected NTE's reliance on a November 4, 2021 letter from its equity investor, because the letter said that full notices to proceed with construction would not issue until financing was approved by the investor's board of directors, but the letter did not specify a date by which such board approval was expected to occur. ISO-NE Term. Filing 7 & n.19.  NTE later proffered a declaration stating that "[i]n conversations with NTE, [the equity investor] specified that it expected to obtain Board approval and to issue Final Notices [to proceed] in December[.]"  NTE Pet. Attach. B ¶ 15.   But NTE did not provide this declaration to ISO-NE before ISO-NE decided to terminate Killingly's capacity supply obligation, nor did NTE provide FERC any corroborating evidence from the equity investor.

As the majority concedes, NTE proffered a "unique" financing structure where NTE claimed it could fully proceed with construction prior to having funds in hand.  ISO-NE's expert consultant explained, and FERC credited, that "on most projects," a full notice to proceed does not issue until "after financing has closed with the lending institutions that are providing the funds, often on the same day and part of the closing proceedings."  NTE Pet. Attach. F at 3.  It stands to reason that on a project costing hundreds of millions of dollars, contractors would require proof of financing and the actual payment of deposits prior to starting work and ordering

equipment, rather than promises that financing and funds will be forthcoming soon. FERC acted well within its discretion to find it was "persuaded by the evidence provided by ISO-NE," 178 FERC ¶ 61,001 at P 26, and to reject NTE's eleventh-hour, self-serving uncorroborated hearsay that construction would proceed in a manner contrary to ordinary industry practice. *See Phoenix Herpetological Soc'y, Inc. v. United States Fish & Wildlife Serv.*, 998 F.3d 999, 1006 (D.C. Cir. 2021).

When rejecting a similar challenge to FERC's predecessor many decades ago, the Supreme Court observed:

> The findings of the Commission in this regard leave much to be desired since they are quite summary and incorporate by reference the Commission's staff's exhibits on allocation of cost. But the path which it followed can be discerned. And we do not believe its findings are so vague and obscure as to make the judicial review contemplated by the Act a perfunctory process.

*Colorado Interstate Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 595 (1945). The Court's reasoning has been followed in *State Farm*, *FCC v. Fox Television Stations*, and countless times since. We are duty bound to follow it here. I respectfully dissent.