# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued May 1, 2024    Decided August 23, 2024

No. 23-1041

PACIFIC GAS AND ELECTRIC COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA,
INTERVENOR

————

Consolidated with 23-1127

————

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

————

*Elaine J. Goldenberg* argued the cause for petitioner. With her on the briefs were *Joshua S. Levenberg*, *Alexandra J. Ward*, *Helen E. White*, and *Henry Weissmann*. *Laura J. Edelstein* entered an appearance.

*Scott Ray Ediger*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Jeffrey M. Bayne* argued the cause for intervenor in support of respondent. With him on the brief were *William S. Huang* and *Anree G. Little*.

Before: WILKINS, RAO, and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

Concurring opinion filed by *Circuit Judge* PAN.

RAO, *Circuit Judge*: This case is part of a long running dispute about Pacific Gas and Electric's ("PG&E") obligations to wheel energy to the customers of the San Francisco Public Utilities Commission ("SFPUC"). While the Federal Energy Regulatory Commission generally cannot order wheeling, a grandfathering clause allows FERC to order wheeling on behalf of certain utilities to an "ultimate consumer," if the utility was providing service to that consumer on October 24, 1992. 16 U.S.C. § 824k(h)(2). PG&E incorporated this grandfathering clause into its tariff. SFPUC and PG&E disagree about which consumers are entitled to wheeled service. We vacated FERC's first order in this dispute because the Commission failed to analyze the statutory requirements. On remand, FERC adopted a class-based interpretation of "ultimate consumer." Because FERC's interpretation cannot be squared with the statutory text, we grant PG&E's petition for review and vacate the orders.

3

I.

A.

PG&E, an investor-owned utility operating in California, provides electricity to the majority of consumers in San Francisco. SFPUC, a publicly owned utility, generates power in the Hetch Hetchy Valley and sells it to end users in San Francisco. SFPUC's typical customers include municipal departments such as the Port of San Francisco and the Recreation and Parks Department, and other public departments like the school district and housing authority. SFPUC also serves some private consumers in San Francisco, competing with PG&E. Because SFPUC does not own distribution lines within the city, it relies on PG&E to wheel, i.e., distribute, its energy. These wheeling arrangements were historically governed by a series of bilateral agreements, the last of which expired in 2015.

PG&E's 2015 Tariff governs the distribution obligations at issue in this case.[1] Section 14.2 of the Tariff provides that SFPUC's customers are entitled to wheeled service if SFPUC can "demonstrat[e] that, for each Point of Delivery for which it claims eligibility for Grandfathering, the criteria of 16 [U.S.C.] § 824k(h)(2) are met." Section 824k(h) prohibits FERC from ordering a utility to wheel power, subject to a few exceptions. The grandfathering exception allows FERC to order wheeling to a municipal utility's "ultimate consumer" if that municipal utility "was providing electric service to such ultimate consumer on October 24, 1992." 16 U.S.C. § 824k(h)(2)(B).

---

[1] The 2015 Tariff was superseded in 2021 by a new tariff that is being litigated separately. *See City and County of San Francisco*, 181 FERC ¶ 61,036 at PP 27–28, 31 & n.66 (2022); *see also* FERC, Docket No. ER20-2878.

The parties disagree about the extent of PG&E's wheeling obligations under the Tariff. In the first round of proceedings before the Commission, San Francisco alleged PG&E was "unreasonably den[ying] service" to SFPUC's customers. PG&E contended it was not obligated to wheel electricity to any delivery point where SFPUC did not provide service as of the grandfathering date. San Francisco maintained the Tariff required PG&E to wheel SFPUC's power to serve the same "types" or "class[es] of customers" that SFPUC had contracted with in 1992. In its 2019 order, FERC rejected San Francisco's class-based approach, concluding that it could not be reconciled with the Tariff's focus on "points of delivery," and that San Francisco's approach could essentially grandfather all of SFPUC's customers. *City and County of San Francisco*, 169 FERC ¶ 61,128 at PP 67–71 (2019).

Granting San Francisco's petition for review, we held that FERC failed to interpret the requirements of section 824k(h)(2), which was "unambiguously … incorporate[d]" into the Tariff. *City and County of San Francisco v. FERC*, 24 F.4th 652, 663 (D.C. Cir. 2022) ("*CCSF*"). We vacated the order and remanded for FERC to interpret section 824k(h)(2) and to provide "a reasoned analysis" of its *Suffolk County* orders, which previously interpreted that provision. *Id.* at 664.

B.

On remand, FERC explained its interpretation of section 824k(h)(2)'s grandfathering clause was controlled by the *Suffolk County* orders. *City and County of San Francisco*, 181 FERC ¶ 61,036 at PP 30–35 (2022) ("*Order on Remand*"). In those orders, FERC specified that the grandfathering clause covered "not only the customers [the relevant entity] was actually serving on October 24, 1992, but also '*all potential* retail customers within the class [the entity] had been serving.'"

*Id.* at P 33 (quoting *Suffolk County Elec. Agency*, 108 FERC ¶ 61,173 at P 19 (2004)). FERC concluded that because the Tariff incorporates section 824k(h), "PG&E must extend … service to: (1) all end-use customers served by San Francisco as of October 24, 1992; and (2) all customers that belong to that same class of customers, even at points of service that were initiated after October 24, 1992." *Id.* at P 37. To define the "class of customers," FERC considered the last bilateral agreement signed between PG&E and SFPUC before the grandfathering deadline. *Id.* at P 38.

After rehearing, the Commission clarified that "eligibility under [16 U.S.C. § 824k(h)(2)] therefore extends not only to the customers who were actually receiving service on October 24, 1992, but also to all subsequently interconnected customers of the same class." *City and County of San Francisco*, 182 FERC ¶ 61,167 at P 68 (2023). FERC also determined that any "customer types that were eligible for city service in 1992 will continue to be grandfathered even where San Francisco adds, consolidates, reconfigures, or relocates customers" so long as the class of customers received service on the grandfathering date. *Id.* at PP 30, 69. To comply with FERC's orders, PG&E updated its service agreement with SFPUC to identify additional delivery points that now qualified for service.

PG&E timely petitioned for review of the orders, and San Francisco intervened in support of FERC. *See* 16 U.S.C. § 825*l*.

## II.

Although FERC does not contest PG&E's standing, we have an independent obligation to ensure we have jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998). To satisfy the requirements of Article III standing, PG&E must demonstrate that it continues to suffer a "concrete,

particularized, and actual or imminent" injury in fact, which is caused by FERC's orders, and "it … [is] likely that a favorable decision of the court will redress the injury." *Farrell v. Blinken*, 4 F.4th 124, 129 (D.C. Cir. 2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

PG&E challenges FERC's interpretation of the 2015 Tariff, which has since been replaced by the 2021 Tariff. Nonetheless, PG&E continues to suffer an ongoing injury. As part of the ordered relief, FERC required PG&E to update its service agreement with SFPUC. PG&E must continue to serve the delivery points of the grandfathered customers identified in that agreement, along with classes of similar customers. *See, e.g.*, *Order on Remand*, 181 FERC ¶ 61,036 at P 30. PG&E argues it is forced to use its facilities "to serve a potentially unlimited number of such future customers," and must "incur … costs to acquire and maintain the facilities necessary to serve those customers." Furthermore, the 2021 Tariff has not fully taken effect, in part because of this ongoing litigation. PG&E has represented it will reclassify some of SFPUC's delivery points, affecting the type of service PG&E would deliver, if it prevails here. *See* Tr. of Oral Arg. at 4–7; *see also CCSF*, 24 F.4th at 657 (holding PG&E could not claim San Francisco's challenge to FERC's order was moot because of the "provisional nature of the proposed tariff revision").

PG&E has actual and ongoing injuries caused by FERC's orders, and those injuries will be redressed if this court sets the orders aside. PG&E therefore has standing to maintain this petition.

III.

We review FERC orders under the Administrative Procedure Act's arbitrary, capricious, or contrary to law standard. *See* 5 U.S.C. § 706(2)(A). We assess whether FERC

provided a reasoned explanation for its decision and whether the order is in accordance with law. *See, e.g.*, *In re NTE Conn., LLC*, 26 F.4th 980, 988 (D.C. Cir. 2022).

In defending its orders, FERC presses for deference and relies on *Chevron* and this circuit's caselaw applying it. But "*Chevron* is overruled." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Courts must "interpret statutes, no matter the context, based on the traditional tools of statutory construction." *Id.* at 2268. We "need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 2273. Therefore, when "addressing a question of statutory interpretation, we begin with the text." *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018). And in "constru[ing] [the] text, we look to the ordinary meaning of its key terms." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024).

A.

PG&E argues that FERC's broad class-based interpretation of the grandfathering clause cannot be reconciled with the plain meaning of the statute. We agree.

Section 824k(h) provides in pertinent part:

> No order issued under this chapter shall be conditioned upon or require the transmission of electric energy:
> (1) directly to an ultimate consumer, or
> (2) to, or for the benefit of, an entity if such electric energy would be sold by such entity directly to an ultimate consumer, unless:
>> (A) such entity is a … State or any political subdivision of a State (or an agency, authority, or instrumentality of

> a State or a political subdivision) … ;
> and
> (B) such entity was providing electric
> service to such ultimate consumer on
> October 24, 1992 … .

In brief, FERC cannot order PG&E to wheel electricity to "an ultimate consumer" of SFPUC unless SFPUC "was providing electric service to such ultimate consumer on October 24, 1992." 16 U.S.C. § 824k(h)(2)(B).

The plain meaning of "ultimate consumer" refers to end users of electric service as of the specified date. Section 824k(h) nowhere references general classes of consumers of electric service. Instead, the provision emphasizes "an ultimate consumer" and "such ultimate consumer," both of which naturally refer to a particular consumer of electric service. We assume that "statutory terms bear their ordinary meaning" unless evidence suggests otherwise. *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1481–82 (2021). The ordinary meaning of "ultimate consumer" refers to a discrete end user, not a class or category of end users unmoored from the statutory text.

Dictionary definitions confirm this ordinary meaning. "Ultimate" typically implicates the "final" or "last" point in a series. *See, e.g.*, *Ultimate*, THE AMERICAN HERITAGE DICTIONARY 1312 (1991) (defining "ultimate" as either (i) "[r]epresenting the farthest possible extent of analysis or division into parts"; or (ii) "[l]ast, as in a series or progression"). And a "consumer" is a purchaser of goods or services. *See Consumer*, BLACK'S LAW DICTIONARY (6th ed. 1990). When combined, the phrase refers to a final person or entity in a distribution chain, i.e., an end user. *See, e.g.*, *Ultimate Consumer*, CAMBRIDGE BUSINESS ENGLISH DICTIONARY 887 (2011) ("the person or organization that buys

a product to use, rather than to sell it to someone else"; "See also 'end-user'").

The Energy Policy Act, taken as a whole, further reinforces that "ultimate consumer" does not refer to general classes of consumers. The Act refers to "ultimate consumer" in two sections—one including classes or groups of consumers and one including only an "ultimate consumer." The grandfathering clause at issue here makes no separate mention of classes or groups. Pub. L. 102-486, § 722, 106 Stat. 2776, 2916–17 (codified at 16 U.S.C. § 824k(h)). By contrast, section 111(e) of the Act provides that the Secretary of Energy must determine whether a resource plan would result in "higher or lower electricity costs to an electric utility's ultimate consumers *or* to classes or groups of such consumers." *Id.* at 2796 (codified as a note to 16 U.S.C. § 2621) (emphasis added). Congress meaningfully distinguished between an ultimate consumer and designated classes of ultimate consumers.[2] FERC's interpretation of section 824k(h) elides

---

[2] Furthermore, the terms "ultimate consumer" and "ultimate consumers" are used a few dozen times in the U.S. Code, and each mention of the terms without the use of "class" or "group" most naturally refers to a specific, discrete consumer. For example, a provision about the Bonneville Power Administration Project states that "[c]ontracts entered into with any utility engaged in the sale of electric energy to the general public shall contain such terms and conditions ... to insure that resale by such utility to the ultimate consumer shall be at rates which are reasonable and nondiscriminatory." 16 U.S.C. § 832d. In other instances, Congress distinguishes between ultimate consumers and classes or groups of consumers. In a provision about the Tennessee Valley Authority, for instance, "all contracts entered into between the Corporation and any municipality … shall provide that the electric power shall be sold and distributed to the ultimate consumer without discrimination … between consumers of the same class." *Id.* § 831k.

this distinction in a manner inconsistent with the statutory text and structure.

Finally, the grandfathering clause is an exception to the general rule against FERC-ordered wheeling. We cannot read an "exception [to] swallow the rule." *Diaz v. United States*, 144 S. Ct. 1727, 1735 (2024); *cf. A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) ("To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretive process."). FERC's expansive interpretation of the grandfathering clause would undermine the primary restriction Congress enacted—namely prohibiting FERC from ordering wheeling. *See* 16 U.S.C. § 824k(h)(1) ("No order issued under this chapter shall … require the transmission of electric energy directly to an ultimate consumer."). Reading "ultimate consumer" to include classes of consumers, without reference to the statutory text, would substantially expand FERC's authority and, as a practical matter, dramatically expand the category of grandfathered consumers.

Considering the text and structure of section 824k(h)(2), as well as the broader statutory context, we conclude that "ultimate consumer" does not refer to an atextual class or group of consumers. FERC's orders are therefore contrary to law.[3]

---

[3] Because we determine that FERC's interpretation of section 824k(h)(2) is contrary to law, we do not consider PG&E's additional arguments that the orders are arbitrary and capricious because they fail to provide a reasoned definition of a class in the context of the 2015 Tariff. Nor do we consider PG&E's arguments about how the 2015 Tariff's "Point of Delivery" language fits with the statutory requirements. On remand, FERC must follow the plain meaning of the statute when determining PG&E's wheeling obligations under section 14.2 of the 2015 Tariff.

B.

FERC and San Francisco advance several arguments against this straightforward conclusion, but none are persuasive.

FERC's primary argument is that it adhered to its *Suffolk County* orders, and the class-based interpretation of "ultimate consumer" in those orders is compatible with the statutory text. But we must seek the "single, best meaning" of a statute, not just permissible interpretations. *Loper Bright*, 144 S. Ct. at 2266. And FERC's class-based reasoning is unpersuasive as a matter of statutory interpretation. FERC did not analyze the text of section 824k(h)(2), but instead relied on the *Suffolk County* orders' interpretation of the provision. *See Order on Remand*, 181 FERC ¶ 61,036 at P 33. Contrary to FERC's assertions before this court, FERC's reasoning in those orders was not based on the statutory text.

Rather, in the first *Suffolk County* order, FERC addressed a unique situation in which Suffolk's customers could not receive electricity service on October 24, 1992, because of a temporary service outage. *Suffolk County Elec. Agency*, 77 FERC ¶ 61,355 at 62,546 (1996) ("*Suffolk County I*"). FERC determined the term "ultimate consumers" covered all of Suffolk's customers "eligible" for service as of the grandfathering date. *Id.* at 62,550 & n.17. In this narrow context, FERC's interpretation avoided the arbitrary denial of grandfathered service for customers of Suffolk who experienced a temporary service interruption on the grandfathering date. *See id.*

In its later orders, FERC adopted a more general class-based approach to "ultimate consumer" in section 824k(h)(2), relying on *Suffolk County I* and policy reasons, rather than the statutory text. *See Suffolk County Elec. Agency*, 96 FERC

¶ 61,349 at 62,301 (2001); *see also Suffolk County Elec. Agency*, 108 FERC ¶ 61,173 at P 19. In response to PG&E's petition here, FERC leans into the broader policy rationale of the *Suffolk County* orders, suggesting a class-based reading of "ultimate consumer" is justified because the "opposite interpretation is unfair" and "has results Congress could not have intended."

But policy concerns cannot override the text of a statutory provision. "An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014). FERC has substantial discretion when approving tariffs as just and reasonable but has no discretion to rewrite statutes to make them more reasonable in the eyes of the Commission. FERC must exercise its authority within the boundaries set by Congress.

San Francisco engages more directly with the text of section 824k(h), arguing that the phrase "*such* ultimate consumer" can be read to include classes of ultimate consumers, and not just a "specific, individual retail customer[]." San Francisco maintains that because the word "such" can mean "of the same class, type, or sort," or "[o]f that kind, having particular quality or character specified," "such ultimate consumer" can include a similar class of ultimate consumers served on the grandfathering date.

We are unpersuaded. In context, "such ultimate consumer" points to a particular end user, not an atextual "class" of end users. "Such" is used six times in section 824k(h). Each mention emphasizes the specific term being qualified, rather than expanding the term to include others of the same class. *Cf. Such*, THE AMERICAN HERITAGE DICTIONARY 1215 (1991) (defining "such" as "[b]eing the same as something implied but

left undefined or unsaid"). Section 824k(h)(2) provides that wheeling can be ordered on behalf of "an entity if *such* electric energy would be sold by *such* entity directly to an ultimate consumer … [if] *such* entity was providing electric service to *such* ultimate consumer on October 24, 1992." 16 U.S.C. § 824k(h)(2) (emphases added). "[S]uch entity" most naturally refers to the same entity that provided service as of the grandfathering date. Similarly, "such ultimate consumer" also refers to the consumer serviced on that date. In context, "such" highlights the previously mentioned consumer or entity. Reading "such" to mean "of the same class" or "kind" is at odds with the most natural reading of the statutory provision.

In sum, FERC's class-based interpretation is inconsistent with the plain meaning of section 824k(h).

* * *

FERC's orders are contrary to law and we vacate them. We remand for FERC to interpret the grandfathering clause because the application of the statutory text to the meaning of the Tariff may "rest[] on factual premises within the agency's expertise." *Loper Bright*, 144 S. Ct. at 2267 (cleaned up); *see also id.* at 2257 (explaining that "exercising independent [judicial] judgment often included according due respect to Executive Branch interpretations"). On remand, FERC must apply the plain meaning of section 824k(h)(2) consistent with this opinion and determine which of SFPUC's consumers qualify for wheeled service under section 14.2 of the 2015 Tariff.

*So ordered.*

PAN, *Circuit Judge*, concurring:

I fully concur with the court's holding that FERC's interpretation of 16 U.S.C. § 824k(h) is contrary to law: The Commission's definition of the term "ultimate consumer" relies on general "classes" of end-users that bear no relationship to the statutory text. Thus, I join the court's decision to vacate FERC's orders and to direct the Commission to reconsider the meaning of "ultimate consumer" on remand. I write separately to set forth my view of the best reading of the statute. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024) ("In an agency case as in any other . . . there is a best reading all the same — 'the reading the court would have reached' if no agency were involved." (citation omitted)).

Section 824k(h) is a grandfathering provision that seeks to preserve or extend municipal wheeling arrangements that were in place in 1992, the year of the statute's enactment. This case requires FERC to determine which "ultimate consumer[s]" qualify for grandfathered wheeling service. In my view, "ultimate consumer[s]" should be defined as the end-users whom the parties intended to serve under the contract or agreement that governed their wheeling arrangement in 1992. That definition is true to the statutory text and what Congress intended, while giving FERC discretion to allow San Francisco to continue serving the retail customers that the city has served for decades.

## I.

More than a century ago, in the Raker Act, Congress granted San Francisco the ability to generate its own power in Hetch Hetchy Valley. *See* Raker Act of 1913, Pub. L. No. 63-41, 38 Stat. 242. The Raker Act's purpose was to provide a source of cheap power and to promote competition in the retail

electricity market in San Francisco. *United States v. City & County of San Francisco*, 310 U.S. 16, 25–26 (1940); *City & County of San Francisco v. FERC*, 24 F.4th 652, 665 (D.C. Cir. 2022) ("Congress authorized the Hetch Hetchy System not only to provide San Francisco with a source of cheap power but also to ensure competition in its retail power market."). Consistent with the Raker Act, San Francisco generates power in the Hetch Hetchy Valley and sells it to consumers in the city. San Francisco uses its own transmission lines to bring its electricity to the city; but it relies on the distribution system of PG&E, the dominant player in the city's electricity market, to get the electricity to end-users. San Francisco's end-users include "City departments, related public entities, entities providing service on behalf of or in coordination with the City, and tenants on City property." J.A. 292. The distribution arrangement between San Francisco and PG&E has ensured delivery of electricity to San Francisco's retail energy customers since 1945.

In 1992, Congress passed a statute that prohibited mandatory retail wheeling — *i.e.*, the practice of ordering a utility to use its facilities to transmit another utility's electricity so that power can be sold "directly to an ultimate consumer." 16 U.S.C. § 824k(h). The purpose of the provision was to stop retail customers from setting up "sham" arrangements to get cheaper wholesale rates for electricity that is intended for retail distribution. *See* 138 Cong. Rec. S17613 (daily ed. Oct. 8, 1992) (statement of Sen. Johnston) (describing how industrial customers can set up paper corporations to seek transmission orders from FERC); Jon R. Mostel, *Overview of Electric Industry Bypass Issues*, 37 Nat. Res. J. 141, 147 (1997) (describing how the issue is most prevalent with "small municipalities with one or more large industrial customers who favor municipalization for their own pecuniary advantage"). In

essence, FERC cannot force a utility to "wheel" (*i.e.*, transmit) a competitor's power under the lower wholesale transmission rate if the competitor is doing so for the benefit of a retail customer. *See* Jeffrey D. Watkiss & Douglas W. Smith, *The Energy Policy Act of 1992 — A Watershed for Competition in the Wholesale Power Market*, 10 Yale J. on Regul. 447, 460 n.56 (1993) (noting that industrial consumers are "the principal beneficiaries of retail wheeling").

The statute includes an exception for situations like San Francisco's, where a municipal utility owns generation and transmission facilities but needs access to distribution lines to get power to its end-users. *See* 16 U.S.C. § 824k(h)(2); *see also* 138 Cong. Rec. S17620 (daily ed. Oct. 8, 1992) (statement of Sen. Wallop) ("[L]egitimate existing co-operative or municipal wholesale sellers . . . may apply for and obtain wheeling that lowers the rates of their retail customers."). Such municipal retail-wheeling arrangements are "grandfathered" under the statute: FERC can require utilities to continue to wheel electricity if "such electricity would be sold by [a State or any political subdivision of the State] to an ultimate consumer" and "such entity was providing electric service to such ultimate consumer on October 24, 1992." 16 U.S.C. § 824k(h)(2)(B).[1]

---

[1]    Section 824k(h) provides, in relevant part:

> (h) Prohibition on mandatory retail wheeling and sham wholesale transactions
>
> No order issued under this chapter shall be conditioned upon or require the transmission of electric energy:
> (1) directly to an ultimate consumer, or

As of 1992, the wheeling arrangement between San Francisco and PG&E was governed by a bilateral interconnection agreement reached in 1987 ("the 1987 Agreement"). The 1987 Agreement provided the terms for PG&E's provision of wholesale distribution services on behalf of the city, which allowed San Francisco to serve its retail energy customers. The 1987 Agreement terminated as of July 1, 2015. In anticipation of the Agreement's expiration, San Francisco applied for wholesale distribution service under PG&E's 2015 Wholesale Distribution Tariff ("the Tariff"). The Tariff incorporates by reference § 824k(h)(2)'s grandfathering provision, and applying the Tariff therefore requires interpreting the statute. *See City & County of San Francisco*, 24 F.4th at 663 ("The text [of PG&E's Tariff] unambiguously indicates that the Tariff incorporates the

---

(2) to, or for the benefit of, an entity if such electric energy would be sold by such entity directly to an ultimate consumer, unless:

> (A) such entity is a Federal power marketing agency; the Tennessee Valley Authority; a State or any political subdivision of a State (or an agency, authority, or instrumentality of a State or a political sub-division) . . . ; and
> (B) such entity was providing electric service to such ultimate consumer on October 24, 1992, or would utilize transmission or distribution facilities that it owns or controls to deliver all such electric energy to such electric consumer.

Nothing in this subsection shall affect any authority of any State or local government under State law concerning the transmission of electric energy directly to an ultimate consumer.

16 U.S.C. § 824k(h).

requirements of [§ 824k(h)(2)].""). In this appeal, we vacate FERC's orders defining the extent of PG&E's wheeling obligation under its Tariff, and we remand for FERC to re-interpret the Tariff and § 824k(h)(2). *See* Op. of the Court 4–5.

## II.

FERC may require a power company to provide retail-wheeling on behalf of any "State or any political subdivision of a State" that sells electricity to an "ultimate consumer" if the State or political subdivision "was providing electric service to such ultimate consumer on October 24, 1992." 16 U.S.C. § 824k(h)(2)(A), (B). Although it is undisputed that San Francisco is a political subdivision that "was providing electric service" to retail end-users on the relevant date, the parties dispute which "ultimate consumer[s]" qualify for grandfathered retail-wheeling.

Section 824k(h)(2) broadly addresses pre-existing municipal wheeling relationships and seeks to maintain the status quo of those relationships. Congress's clear intent was to preserve FERC's ability to mandate retail-wheeling for States and their political subdivisions that historically have provided power to retail customers. *See* 16 U.S.C. § 824k(h)(2); 138 Cong. Rec. S17620 (daily ed. Oct. 8, 1992) (statement of Sen. Wallop). Congress also intended, in the Raker Act, for San Francisco to provide electricity to retail customers, so that power would be less expensive and competition in the retail electricity market would be preserved. *See City & County of San Francisco*, 24 F.4th at 665. Furthermore, in the Federal Power Act, Congress requires FERC "to ensure that rules or practices affecting wholesale

rates are just and reasonable." *Id.* (cleaned up); *see also* 16 U.S.C. §§ 824d, 824e.

FERC can achieve Congress's goals, while faithfully applying the text of § 824k(h)(2), by defining "ultimate consumer[s]" as the end-users that the parties intended to serve under the wheeling contracts or agreements that existed in 1992. That definition adheres to the language of the statute because the wheeling contract between the parties necessarily defines the "ultimate consumer[s]" that the municipality "was providing electric service to" on October 24, 1992. *See* 16 U.S.C. § 824k(h)(2)(B). Such a contract-focused approach is logical because the parties' agreement sets the terms of the pre-existing retail-wheeling relationship that § 824k(h)(2) intends to preserve. Moreover, a contract-based definition relies on the parties' mutual consent and understanding of the relevant wheeling arrangement, and therefore is fair to both the municipality and the utility that wheels its power. By defining "ultimate consumer[s]" as those who fit within the ambit of the parties' wheeling arrangement as of October 24, 1992, the Commission would have discretion to mandate wheeled service to consumers who would have been entitled to service under the parties' agreement on that date. In determining which end-users should receive grandfathered wheeling service, the Commission would draw upon its expertise to interpret the contracts in question and would exercise its discretion to make necessary "technical inquir[ies] properly confided to FERC's judgment." *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 533 (D.C. Cir. 2010).[2]

---

[2] This interpretation is completely consistent with our holding that "'ultimate consumer' does not refer to an atextual class or group of consumers." Op. of the Court 10. The opinion of the court

Under a contract-focused approach, the "ultimate consumer[s]" in this case would be identified by looking to the 1987 Agreement, which governed the wheeling relationship between San Francisco and PG&E on October 24, 1992. That agreement identifies the "ultimate consumer[s]" that San Francisco "was providing electric service to" on the relevant date in 1992. *See* 16 U.S.C. § 824k(h)(2)(B). The 1987 Agreement does not name specific end-users, but rather lists categories of customers in order of priority.[3] FERC could require PG&E to provide service under the Tariff to any of San Francisco's customers that fall within the ambit of the 1987 Agreement. Under this approach, FERC would examine the 1987 Agreement closely to determine whom the parties intended their wheeling arrangement to cover. And FERC's exercise of discretion in this context would be informed by its duty to ensure "just and reasonable" rules and practices. *See*

precludes only classes or categories of ultimate consumers that are not supported by the statutory text. As discussed, *supra*, a contract-based approach is consistent with the statutory language. Under such an approach, if the parties' contract as of October 24, 1992, enumerates classes or categories of customers who are entitled to wheeled service, then such classes or categories may be considered. Thus, the "specific" or "discrete" consumers that we reference in the opinion of the court may include those whom the parties intended to benefit with wheeled service on October 24, 1992 — that group of consumers was identified and specified by contract on the relevant date. *See*, *e.g.*, *id.* at 9 n.2.

[3] Specifically, in sections 2.7.1 and 2.7.2 of the 1987 Agreement, PG&E agreed to wheel power generated in Hetch Hetchy Valley to San Francisco's customers, which are listed in an order of priority. The 1987 Agreement gives priority to San Francisco's Municipal Load, followed by the Irrigation Districts, and then a set of residual categories. J.A. 19 (FERC Order on Remand, describing how the 1987 Agreement "grouped the end-use customers into categories").

16 U.S.C. §§ 824d, 824e.  As we noted in *City and County of San Francisco v. FERC*, such principles should prevent PG&E from "refusing service for customers San Francisco had served for decades" under the 1987 Agreement.  24 F.4th at 665.[4]

A contract-focused definition of "ultimate consumer[s]" addresses three key concerns that have been raised in evaluating other proposed interpretations of the statute.  First, it prevents the unfettered expansion of San Francisco's retail service, which was a possible consequence of the general class-based approach.  *See* Op. of the Court 10.  FERC's general classes of consumers could sweep in entities that did not exist in 1992, so long as they were similar to entities that were served at that time:  For example, if San Francisco served one restaurant in 1992, the city could potentially serve all restaurants in 2024.  By contrast, under a contract-focused approach, a restaurant that previously did not exist might not qualify for grandfathered status, even if it were in the same "class" as another restaurant that did receive service in 1992.  FERC would examine whether the pre-existing wheeling agreement in 1992 reflected an intention to cover the new restaurant in question.  And the Commission could make its determination with a view toward maintaining the status quo from 1992 and thus could prevent an uncontrolled expansion of the municipality's customer base.

---

[4]    In this case, adopting a contract-focused definition of "ultimate consumer[s]" may not be very different, in practice, from what FERC already has done.  That is because FERC, after adopting its atextual "class-based" definition of "ultimate consumer," applied that erroneous definition by referencing the 1987 Agreement.  But a contract-focused approach avoids any reliance on generalized "classes" that are divorced from the statutory language.

Second, a contract-focused approach also would avoid the problems posed by PG&E's proposed interpretation of the statute, which posits that only the actual customers who received service on October 24, 1992, are grandfathered. In considering such an inflexible interpretation of § 824k(h)(2), the *Suffolk County* cases noted that if the statute is read to grandfather only users who actually received service on October 24, 1992, FERC would be forced to treat two neighbors differently where both were entitled to receive service on that day, but one of them experienced a power outage. *See Suffolk Cnty. Elec. Agency*, 77 FERC ¶ 61,355, 62,550 n.17 (1996) ("*Suffolk County I*"). While our opinion for the court in this case takes issue with the atextual approach that FERC developed following *Suffolk County I*, *see* Op. of the Court 11–12, we do not deny that it would be anomalous and contrary to congressional intent to provide grandfathered service to one neighbor, while excluding the other, in that hypothetical situation. Under my contract-focused methodology, a house that lost power on the specified date in 1992 would be grandfathered if it were within the scope of those "who were eligible to receive service" under the retail-wheeling arrangement that existed in 1992. *See Suffolk County I*, 77 FERC at 62,550 n.17. Moreover, FERC would not have to compile and compare lists of current and past end-users to determine who is grandfathered, as would be required under PG&E's rigid interpretation.

Finally, a contract-focused approach is consistent with congressional intent because it avoids the winnowing of San Francisco's pool of retail customers over time and allows San Francisco to remain in the retail market. Under a contract-focused interpretation of the statute, FERC could continue to mandate wheeling that would allow San Francisco to rely on PG&E's distribution lines, so long as the customers served are

those that were contemplated by the 1987 Agreement. Without such sustained mandatory wheeling, San Francisco eventually would be forced to turn its customers over to PG&E because San Francisco cannot afford to build its own duplicative distribution facilities. *See* Oral Arg. Tr. at 40:6–40:19 (FERC's counsel noting that PG&E would prefer to serve San Francisco's end-users directly through their retail tariff, rather than serve the city under the wholesale tariff). Although PG&E is in favor of "winnow[ing]" San Francisco's customer base, *see* PG&E Br. 31, that result would not be consistent with congressional intent, as expressed in both the Raker Act and § 824k(h)(2). The Raker Act is aimed at preserving competition in the *retail* power market. *United States v. City & County of San Francisco*, 310 U.S. at 26 (noting that San Francisco is supposed to sell Hetch Hetchy power "*directly* to consumers" in competition with PG&E (emphasis added)); *City & County of San Francisco*, 24 F.4th at 665 (noting that the Raker Act aimed "to ensure competition in [San Francisco's] retail power market"). And, as discussed, § 824k(h)(2) seeks to preserve municipal wheeling arrangements, like the one between San Francisco and PG&E, that existed as of October 24, 1992.

\* \* \*

In my view, the best reading of the statute adopts a contract-focused approach that defines "such ultimate consumer[s]" as the end-users that fall within the ambit of the parties' retail wheeling agreement as of October 24, 1992. That definition is true to the statutory language and is consistent with Congress's intent to preserve the municipal wheeling arrangements that were in existence in 1992. It also provides a workable framework that allows FERC to apply the statute in a manner which "ensure[s] that rules or practices affecting

wholesale rates are just and reasonable."  *City & County of San Francisco*, 24 F.4th at 665; *see also* 16 U.S.C. §§ 824d, 824e.